

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA **FILED** :  CRIMINAL ACTION

v.               DEC 2 1 2011    :

JOSEPH KONRAD      MICHAEL E. KUNZ, Clerk    NO. 11-15
                   By_____Dep. Clerk

### MEMORANDUM RE: REIMBURSEMENT OF ATTORNEY FEES

**Baylson, J.**                                                **December 21, 2011**

The issue presented, raised sua sponte by the Court, is whether, and if so to what extent,

the Defendant must reimburse the Court because he was represented by the Federal Community

Defender, based upon this Court's finding that Defendant had sufficient assets to retain his own

counsel in this case.

This case starts with the Defendant's receipt of a letter from the United States Attorney's

Office, advising him that he was the target of a grand jury proceeding, and suggesting that he

contact the Federal Defender's Office if he was unable to afford counsel. Defendant did so,

consulting Assistant Federal Defender Felicia Sarner, Esquire, an experienced member of the

criminal defense bar. The Defendant filled out a financial affidavit and appeared in front of

Magistrate Judge Wells on November 15, 2010 for an appointment of counsel hearing. This

affidavit, which was not in the Court's file but was provided subsequently by Ms. Sarner, shows

that the Defendant had a very substantial retirement fund, additional sums in a checking account,

and listed some current income. Although the affidavit also showed a liability for a mortgage,

the affidavit does not make any disclosure of the value of the underlying real estate asset. A

1

Magistrate Judge appointed the Defender Association to represent the Defendant in Grand Jury 2010-750 No. 2.

On January 6, 2011, the government filed an Information charging Defendant with one count of knowingly and willingly making "materially false, fictitious, and fraudulent statements and representations" to the Federal Aviation Administration ("FAA") in violation of 18 U.S.C. § 1001. ECF No. 1, at 1-2. As customary, the filing of an Information indicates the Defendant has entered into a guilty plea agreement with the United States Attorney's Office.

On February 22, 2011, represented by Ms. Sarner, Defendant entered a guilty plea in open court. ECF. No. 14. The Court scheduled a sentencing hearing for May 25, 2011 and ordered a pre-sentence report. ECF. No. 11. At the sentencing hearing, the Court noted that the financial section of the presentence report revealed substantial assets of the Defendant, individually, and also jointly with his wife. Defendant was sentenced to three years probation, plus to pay a fine of $2,500.00 and an assessment of $100.00. ECF No. 22.[1]

## I.    FINANCIAL INFORMATION - PRESENTENCE REPORT

Beginning at paragraph 61, the presentence report shows that the Defendant for many years had significant employment income which seems to terminate in about 2008. The presentence report does not distinguish between assets held individually as opposed to those held jointly. For example, the residence where Defendant lived is a joint asset but is listed as part of

---

[1]This financial information is not on the docket, as the Court received it only through an unfiled letter and Affidavit from Defendant's attorney, and the original financial affidavit filed was sealed. As such, it may only be appropriate to mention Defendant's IRA funds generally.

the Defendant's net worth.[2]

However, paragraph 63 of the presentence report does show that the Defendant's IRA had substantial value, as of March 26, 2011. In addition, the Defendant had an individual checking account with a lesser but still considerable sum.

In light of this information, on June 22, 2011, the Court sua sponte entered an Order to Show Cause regarding whether defendant should have had Court appointed counsel. ECF. No. 24. At the July 27, 2011 Show Cause Hearing, Defendant's attorney, Ms. Sarner, argued that Defendant should not be required to make reimbursement to the Court for counsel fees. Her principal argument was that Defendant's low income demonstrated that he was financially unable to afford counsel. ECF No. 26. The Court ordered Defendant to submit a financial affidavit detailing all assets and liabilities owned by him individually and jointly with his spouse. ECF No. 17. Defendant submitted the financial affidavit ("the Affidavit") on September 16, 2011.[3]

---

[2]The Court believes it is not appropriate in this type of situation, at least because there is no evidence the Defendant's wife had any involvement in this offense, and his wife has not consented to consideration of her own assets, to include her assets in determining financial responsibility for retaining legal counsel.

[3]The Affidavit and the background facts were provided by letter and representations at the hearing noted below by Ms. Sarner, whom the Court credits completely for her recollection of the events, and appreciates her candor. This financial information is not on the docket, as the Court received it only through an unfiled letter and Affidavit from Defendant's attorney, and the original financial affidavit provided to the Magistrate Judge was sealed. The amount of Defendant's assets will not be disclosed in this Memorandum Opinion because the information is not necessarily part of the public record. The Court only notes that the total amount of Defendant's retirement funds is "five figures" and substantially in excess of any amount that a private attorney would charge to represent Defendant in this type of case, particularly where the Defendant intended to plead guilty from the very beginning and did so.

3

## II.   DEFENDANT'S FINANCIAL AFFIDAVIT SUBMITTED POST-SENTENCING

The Affidavit lists individual assets, including a Fidelity IRA and a Travelers IRA.
Affidavit (Sept. 14, 2011).  Defendant lists his individual monthly income as $750.00.

## III.   LEGAL STANDARD

Under 18 U.S.C. § 3006A ("Criminal Justice Act" or "CJA"), "[r]epresentation shall be
provided for any financially eligible person" who, as Defendant, is charged with a felony. §
3006A(a)(1)(A).  The statute also provides that "[u]nless the person waives representation by
counsel, the United States Magistrate judge or the court, if satisfied after appropriate inquiry that
the person is financially unable to obtain counsel, shall appoint counsel to represent him." §
3006A(b).  The statute does not define financial eligibility.  See id.

The Guide to Judiciary Policy ("Guide"), however, explains that "[a] person is
'financially unable to obtain counsel' within the meaning of 18 U.S.C. § 3006A(b) if the
persons's net financial resources and income are insufficient to obtain qualified counsel."
Judiciary Policy Guide, § 210.40.30(a).  "In determining whether such insufficiency exists,"
courts should consider "the cost of providing the person and his dependents with the necessities
of life. . . ."  Id. at § 210.40.30(a)(1).  The Guide also specifies that the initial eligibility
determination should not take into account the person's family's income "unless the family
indicates willingness and financial ability to retain counsel promptly." § 210.40.50.  It further
directs that "[a]ny doubts as to a person's eligibility should be resolved in the person's favor;
erroneous determinations of eligibility may be corrected at a later time." Id. at § 210.40.30(b).

The Criminal Justice Act provides a mechanism for this later correction of the eligibility
determination. § 3006A(f).  The Act provides that "[w]henever the United States magistrate

4

judge or the court finds that funds are available for payment from or on behalf of a person
furnished representation, it may authorize or direct that such funds be paid . . . to the court for
deposit in the Treasury as a reimbursement to the appropriation . . . to carry out the provisions of
this section." Id.; see also Judicial Policy Guide at § 230.40(c); United States v. Evans, 155 F.3d
245, 251 (3d Cir. 1998) (explaining that district courts have the power under the CJA to order
reimbursement of counsel fees at any time). In other words, "[w]hat the Act gives with one hand
to a criminal defendant 'financially unable' to pay for legal services it takes away with the other
if the defendant turns out to be 'financially able' to obtain counsel." United States v. Wilson, 597
F.3d 353, 357 (6th Cir. 2010).

The Guide elaborates on when and what a court may consider when determining whether
the person has funds "available" to pay for representation. It states that prior to sentencing, the
court should consider "the information contained in the presentence report, the court's intention
with respect to fines and restitution, and all other available data bearing on the person's financial
condition, in order to make a final determination concerning whether the person then has funds
available to pay for some or all of the costs of representation." Judicial Policy Guide §
210.40.30(d). Then, "in appropriate circumstances, [the court] should order the person to
reimburse" the costs of representation. Id. The Guide specifies "[f]uture earnings should not be
considered or subject to a reimbursement order; however, other income or after-acquired assets
which will be received within 180 days after the date of the court's reimbursement order may be
available as a source of reimbursement." Id. at § 210.40.30(5). At or following appointment of
counsel, a court may also "inquire into the financial situation of the person's spouse . . . and if
such spouse . . . indicate[s] their willingness to pay all or part of the costs of counsel, the judicial

5

officer may direct deposit or reimbursement." Id. at § 210.40.50.

Finally, if a court finds that "a person's net financial resources and income anticipated prior to trial are in excess of the amount needed to provide the person and that person's dependents with the necessity of life . . . but are insufficient to pay fully for retained counsel," the court should appoint counsel under the CJA and direct the person to pay the excess funds toward the representation costs. Id. at § 210.40.40.

## IV.    ANALYSIS

Defendant bears the burden of proving by a preponderance of the evidence he is financially unable to repay the costs of representation. Evans, 155 F.3d at 252 n.8. A district court is nevertheless required to make appropriate findings of fact on a defendant's ability to contribute funds under § 3006A(f). Id. In this case, the Court held a hearing on September 16, 2011 on this question with Defendant and his wife present. The Court requested the Defendant submit a detailed financial affidavit. Having reviewed the testimony and Defendant's argument at the hearing, the Affidavit, and the relevant legal authorities, the Court makes the following findings.

### A.    Defendant's Wife's Income and Individually-Held Assets

Defendant's wife has not indicated that she is willing and financially able to pay all or part of the costs of counsel, as the Judicial Policy Guide section 210.40.50 requires for a court to order reimbursement from a family member's funds. See Judicial Policy Guide, § 210.40.50. Furthermore, courts should consider only assets that a defendant "owns and controls." United States v. Lexin, 434 F. Supp. 2d 836, 841-42 (S.D. Ca. 2006). The Court therefore does not include Defendant's wife's income and individually-held assets in determining Defendant's

6

ability to retain qualified counsel.

## B.    Jointly Owned Assets

Courts must consider a defendant's "personal and family needs and the liquidity of his finances" when determining whether to order reimbursement of representation costs. Evans, 155 F.3d at 252 n.8. The Seventh Circuit, in particular, has advised that district courts should inquire into "whether requiring the contribution would impose an extreme hardship on the defendant, whether it would interfere with his obligations to his family." U.S. v. McGiffen, 267 F.3d 581, 589 (7th Cir. 2001). Furthermore, "inability to pay is not the same as indigence or destitution." United States v. Cohen, 419 F.2d 1124, 1127 (8th Cir. 1969). The Court finds that the jointly owned house should not be considered in determining Defendant's present ability to reimburse costs, because (a) there is also a joint home loan of 90% of the value, (b) the home is not a sufficiently liquid asset, and (c) to deprive Defendant of his home would undoubtedly result in hardship for him and his wife. The same logic applies to one of Defendant's cars, to which Defendant has a car loan in excess of the car's present value. Defendant's other jointly-owned car has little value.

According to the affidavit, the Defendant and his wife also have a joint checking account. Defendant's wife's average monthly income (not including overtime) plus Defendant's average monthly income (which does not appear to include any unemployment benefits he is collecting in addition to the payment he receives as a Zumba instructor) are close to the estimated joint monthly living expenses. With overtime or unemployment payments, or a slight decrease in expenses, the checking account funds would exceed the costs of providing for "the necessities of life" of Defendant and his wife. See Judicial Policy Guide at § 210.40.30(a)(1).

There does not appear to be any Third Circuit authority, and very little other authority, on whether joint accounts may be considered available funds under the CJA. The only case to address a similar issue was Lexin, where the court found, without much discussion, that community property assets (co-owned by the defendants' spouses) could not be considered in determining eligibility for appointment of counsel. 434 F. Supp. 2d at 842-43. Arguably, however, Defendant does own and control, at least partly, the assets in the joint bank accounts. See id. Ultimately, "each factual situation must be weighed by the trial judge," and the CJA "leaves much to the sound discretion of the court asked to grant an order of reimbursement." United States v. Bracewell, 569 F.2d 1194, 1198-99 (2d Cir. 1977). In view of the findings below concerning Defendant's IRA accounts, there is no need to make a conclusion concerning Defendant's joint assets.

## C.   **Defendant's IRAs Containing Retirement Funds**

The Court finds that Defendant has sufficient "available" funds in his IRA retirement accounts to cover the costs of his representation. Defendant contends that the Court should not consider his two IRA accounts as funds "available" to cover the cost of representation. The Third Circuit has never considered this issue. In support of this argument, Defendant relies on Lexin, 434 F. Supp. 2d 836, in which the court found it could not consider retirement funds in its financial eligibility determination.[4] 434 F. Supp. 2d at 845. Lexin reasoned that a retirement fund was "future income" not to be considered for reimbursement pursuant to the Judicial Policy

---

[4] Defendant also cited United States v. Bracewell, 569 F.2d 1194 (2d Cir. 1977). This case does not address retirement accounts, however, but rather speaks generally about taking hardship to a defendant into account when considering ordering reimbursement ("[t]he test is whether repayment would cause such financial hardship as to make it impractical or unjust.").

Guide section 210.40.30(5) because it "cannot be taxed until it is withdrawn during retirement."

Id. The court also found that federal law typically exempts retirement accounts from alienation

or attachment and noted that the CJA 23 financial affidavit form does not specifically ask a

defendant to list retirement accounts. Id. In reaching its conclusion, Lexin declined to decide

whether the defendants would be able to borrow funds to pay for or contribute to their

representation costs. Id.

     Other courts to consider this issue have, however, rejected the Lexin's reasoning. See

United States v. Pani, No. 08-40034, 2011 WL 4344336, at *2 (D. Mass. Aug. 3, 2011); In re

extradition of Patel, No. 08-430, 2008 WL 896069, at *2 (D. Or. March 28, 2008). These courts

found unpersuasive the argument that retirement funds represent future income. Pani, 2011 WL

4344336, at *2; Patel; No. 08-430, 2008 WL 896069, at *2. As the Patel court explained:

> [s]imply because an IRA account . . . is not taxed until those funds are withdrawn
> does not make the funds in that account 'future income' in the sense contemplated
> in the Guide. The deposits into an IRA are, for the most part, from past earned
> income. The income is "future" only in the sense of when it is taxed, not when the
> respondent comes into possession of it.

2008 WL 896069, at *2. See also Pani, 2011 WL 4344336, at *2. In Pani, the court also

concludes that Lexin places undue weight on the wording of the CJA 23 affidavit form. 2011

WL 4344336, at *2. It states that although retirement accounts enjoy some protections, those do

not apply when considering appointment of counsel. Id. Furthermore, Pani explains, in

determining eligibility for appointment of counsel, a court does not attach, levy or dispose of the

retirement funds, which Lexin notes, is prohibited in bankruptcy proceedings. Id. (citing Lexin,

434 F. Supp. 2d at 845).

     Finally, in Patel, the court also notes Lexin's finding regarding IRAs is only dicta because

Lexin had already concluded that the defendants' legal fees would exceed $1,500,000, a sum greater than the retirement funds. 2008 WL 896069, at *2 (citing Lexin, 434 F. Supp. 2d at 840). Both courts determined that the IRA retirement funds were available to the respective defendants and found them ineligible for appointment of counsel under the CJA. Pani, 2011 WL 4344336, at *2; Patel; No. 08-430, 2008 WL 896069, at *2.

**D.    Public Policy Factors**

There are strong public policy interests which the Court will consider.

The Sixth Amendment right to counsel is a fundamental constitutional safeguard for each individual charged with a crime, and to he provided with court-appointed counsel if one cannot afford for counsel with their own funds. The Criminal Justice Act, reviewed above, details the methodology and standards for federal courts appointing counsel.

The Federal Community Defender operates nationwide and locally with public funds appropriated by Congress. Their work is supervised to some extent by the United States Judicial Conference, which has a specific committee charged with oversight of Defender services.

The Second Circuit has recognized that "CJA funds are a necessarily limited resource" and that the public has a "strong interest in how its funds are being spent in the administration of criminal justice." United States v. Parker, 439 F.3d 81, 109 (2d Cir. 2006). "The reimbursement statute, which was duly enacted to carry out salutary policies and which provides for notice of the intended order of recoupment, creates a constitutionally proper ground for depriving a financially able defendant of available funds which, in fairness, should be remitted to the public coffers." Bracewell, 569 F.2d at 1197 (citing Fuller v. Oregon, 417 U.S. 40 (1974) ("in which the Supreme Court upheld an Oregon recoupment provision in the face of a constitutional challenge")).

To conserve the limited resources of the Federal Community Defender for those truly unable to afford qualified counsel, federal judicial officers must carefully review the financial data of each defendant to determine those defendants who can afford to pay for counsel. The Court recognizes that the amount necessary to retain counsel may depend on the nature of the offense and whether the defendant eventually pleads guilty or preserves the right to a trial. Nonetheless, a defendant with substantial assets, but who would just prefer not to withdraw sizable retirement funds, is not entitled to appointed counsel unless the retirement funds are inadequate to pay for counsel. In this case, given the nature of the charges, a fairly simple case of a false statement to a federal agency where the Defendant clearly intended to plead guilty from the beginning, would not require a fee anywhere close to the amount of the Defendant's retirement fund.[5]

It is also obvious that many defendants, particularly those with any knowledge of the criminal justice system, will recognize that public defenders are highly qualified. Particularly in this district, the Federal Community Defender is a very sought after job employing highly skilled lawyers with many years of experience. The Federal Defender has a highly praised training

---

[5]Chief Judge Claire Eagan of the Northern District of Oklahoma, who chairs the Judicial Conference Committee on Defender Services, stated in an interview in August 2011 that the Committee has "frozen defender staffing and cancelled training and administrative conferences for panel attorneys and federal defender organizations in an effort to adjust to current fiscal challenges." Interview: Committee Key to Delivery of Effective Defense Services, The Third Branch (August 2011), http://www.uscourts.gov/News/TheThirdBranch/11-08-01/Interview_ Committee_Key_to_Delivery_of_Effective_Defense_Services.aspx. These severe restrictions on hiring have negatively affected federal defender offices around the country. See id. One office has seen a 50 percent increase in caseload without any additional staff, while in another district an authorized branch office could not be opened. Id. "There is a fear that the quality of representation will be adversely affected by these staffing shortages," noted Chief Judge Eagan. Id.

11

program, and many judges of this Court attend its annual Continuing Legal Education Seminar where new decisions are highlighted and lectures are presented on important points of strategy. A defendant may clearly prefer to have a Federal Defender for the skill that these lawyers bring to their clients, and having this high level of legal representation without charge would be attractive to many.[6]

There is also a strong public policy interest in supporting a private defense bar in the local legal community. Persons involved in criminal investigations, or accused of crimes, who can afford to retain private counsel, should be required to do so, so that the lawyers who chose to practice criminal law on the defense side will have a source of clients. The presence of an independent criminal defense bar serves many sound goals.

This Court has a very active roll of very competent criminal defense attorneys who have qualified to be part of the Court's CJA panel, who are appointed to represent indigent defendants when the federal defender has a conflict, which arises in many cases. Lawyers who are members of the CJA panel would not be able to afford to practice criminal law if they only got CJA appointments. In order to have the appropriate experience and training, they must have a source of private clients within this community, who can afford to pay reasonable fees, so that they can become skilled advocates.

Also, a local defender association may have a particular way of practicing criminal law,

_____

[6]A recent news article related a study by the RAND Corp. which showed that in murder cases, the Philadelphia (state court) Public Defender secured better results than private attorneys. See article in Philadelphia Inquirer dated December18, 2011, entitled "Public Defender Versus Court Appointee – A study says Philadelphia defendants with court-appointed lawyers fared worse in murder trials," by Joseph Slobodzian and Nancy Phillips. This article details the report of the RAND study that showed that the Philadelphia Public Defenders attorneys defending clients accused of murder secured significantly better results than private attorneys.

12

or policies regarding their criminal clients, which does not fit everyone who comes through the

criminal justice system. These considerations concern plea bargaining, motion practice,

sentencing advocacy and appellate advocacy. Diversity in the criminal defense bar, in terms of

strategies, tactics, and different styles of representation, is very healthy.

## V.    CONCLUSION

Many of the cases reviewed above considered a defendant's financial eligibility for

appointment of counsel at the initiation of the proceedings, whereas in this case, the criminal

proceedings have been completed. Ideally, this issue might have been flagged at the outset of the

proceedings given Defendant's disclosure in his initial financial affidavit that he had a substantial

IRA account. However, often the criminal process demands immediate provision for counsel and

there would have been a delay for Defendant to make the necessary withdrawal from his IRA

account. The Court does not fault anyone who was involved in this case for not insisting on that

at the outset.

For all of the factual reasons and the policy reasons set forth above, the Court will require

Defendant to reimburse the Court for the value of his representation by the Federal Defender.

The Court easily finds that Defendant was not entitled to court-appointed counsel in this case.

The only question remaining is the amount of the fair value of the representation.

Choosing the CJA rate or structuring an hourly rate for the federal defender's services would not

be an adequate measure of the benefit that the Defendant received. Rather, a better measure of

the amount of reimbursement would be to calculate how much the Defendant would have had to

pay for private counsel. The Court has considered whether it can pick a figure based on its

assumptions or could consult among colleagues or members of the criminal defense bar on an ex

13

parte basis to determine this amount. Either alternative has insufficient transparency.

The Court has determined to appoint a Master to review this matter, which should not be an involved, complex or lengthy process. Although the criminal rules do not provide for provision of a Master, the civil rules do, in Rule 53, F. R. Civ. P. This issue, concerning reimbursement to the Court, is essentially a financial matter not directly involved in the criminal prosecution of Defendant, which has been completed. Therefore, the Court will borrow from the provisions of Rule 53, F. R. Civ. P., and also Rule 54(a)(2)(D), which specifically allows a Court to appoint a Master to assist the Court in determining the amount of attorneys fees.

An appropriate Order follows.

O:\Criminal Cases\11-15 U.S. v. Konrad\Konrad 11-15 Memo 12-20-11.wpd

14